**The below described is SIGNED.**

Dated: September 27, 2012

R. KIMBALL MOSIER
U.S. Bankruptcy Judge



---

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re:<br><br>Nathan Lloyd Archibald,<br><br>      Debtor. | Bankruptcy Number: 10-31764<br><br>Chapter 7 |
| In the Paint, LLC, a Utah Limited Liability Company and Collins, Inc., a Utah Corporation,<br><br>      Plaintiffs,<br><br>v.<br><br>Nathan Lloyd Archibald,<br><br>      Defendant. | Adversary Proceeding No. 10-03057<br><br>Judge R. Kimball Mosier |

### MEMORANDUM DECISION

This is an adversary proceeding brought pursuant to 11 U.S.C. § 523(a)(2)(A) and

§ 727(a)(2) & (5)[1] by In the Paint, LLC, and Collins, Inc.(collectively Plaintiffs) against Nathan

---

[1]Unless otherwise noted, all subsequent statutory references are to Title 11 of the United States Code.

Lloyd Archibald (Defendant or Archibald).  The trial in this matter began on June 25, 2012 and

continued on June 26, 2012 and June 28, 2012.  At the conclusion of the Plaintiffs' presentation

of evidence, the Defendant filed a "Motion for Judgment as a Matter of Law on Plaintiffs' 523(a)

Claim."   That motion was followed by the Defendant's oral motion seeking judgment in the

Defendant's favor on the § 727 claim.  The Court permitted the Defendant until July 2, 20012 to

file additional briefing addressing both the § 523 and § 727 issues and permitted Plaintiffs until

July 6, 2012 to file a reply brief.  Both parties timely briefed the merits of their arguments, and

the Court heard oral arguments on July 9, 2012.  The Court has carefully reviewed the pleadings,

the evidence presented and the arguments of counsel.

The Court views the Defendant's motion as a motion for judgment on partial findings as

provided under Federal Rule of Evidence 52(c) made applicable by Federal Rule of Bankruptcy

Procedure 7052(c) and dismissal under Federal Rule of Evidence 41.[2]  When a court is presented

with a Rule 52(c) motion, the court must undertake the fact finding process which involves a

weighing of the evidence and an assessment of the credibility of the witnesses to determine

whether or not the plaintiff has demonstrated a factual and legal right to relief.[3]  "In a case tried

without a jury, the trial court is not required to consider the evidence in the light most favorable

to the plaintiff in determining whether to grant a motion to dismiss under Rule 41 made at the

completion of the plaintiff's case."[4]  After considering the evidence, including facts as stipulated

---

[2]*See Woods v. North American Rockwell Corporation,* 480 F.2d 644, 645-46 (10th Cir. 1973).

[3]*Feldman v. Pioneer Petroleum, Inc.*, 813 F.2d 296, 299 & n. 4 (10th Cir.), *cert, denied,* 484 U.S. 954 (1987).

[4]*Woods v. North American Rockwell Corporation*, at 645-46.

to or admitted by the parties, or as adduced from testimony of various witnesses, or as

established by the introduction of exhibits, and after assessing the credibility of the witnesses,

and considering the arguments of counsel, and conducting an independent review of the law, the

Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In the Paint, LLC (ITP) was engaged in the promotional products industry (the Promo

Industry).  Its business involved the sale and production of promotional products.  At all relevant

times, Sean Collins (Collins) has been the majority owner of ITP.

Jason Marsh (Marsh) first became associated with ITP as a salesman and sometime prior

to December of 2006 became a 25% owner and president of ITP.  In late December 2006, at a

lunch meeting (Lunch Meeting), Marsh informed Collins that he intended to leave ITP.  During

the Lunch Meeting, Marsh and Collins began discussing various alternatives for an agreed

resolution of issues related to Marsh's decision to leave ITP.  Marsh informed Collins that if

Marsh continued  working in the Promo Industry, his business would be named Prodigy Promos

(Prodigy).  Marsh had registered the domain name PRODIGYPROMOS.COM in 2004 and

Marsh and his wife Jill had organized Prodigy and registered "Prodigy Promos L.C." with the

Utah Department of Commerce on November 30, 2006.

Archibald was hired by Marsh to work as a salesperson for ITP and was employed by

ITP until January 2007.  During his employment, Archibald's employment contract prohibited

Archibald from (a) working in or for a competitor of ITP in the Promo Industry, and (b)

soliciting business from ITP's customers (collectively, the Noncompetition Obligations).

In December of 2006, Archibald solicited orders on behalf of Prodigy from at least two ITP customers (the Two Orders), those being Sun Edison and the American Red Cross.  On December 13, 2006, Archibald originated Prodigy purchase order no. 803 for Sun Edison in the amount of $3,039.74, and on December 13, 2006, Archibald obtained an order for the American Red Cross as evidenced by Prodigy Invoice No. 505 in the amount of $2,736.12.  Archibald did not disclose to ITP that he had taken the purchase orders from Sun Edison or the American Red Cross for the benefit of Prodigy.

In early January 2007, but prior to January 23, 2007, the controller of ITP discovered a document[5] pertaining to Prodigy (the Prodigy Incident).  The document revealed that Prodigy had been conducting activity prior to that date and probably prior to the Lunch Meeting. The day the ITP controller discovered the Prodigy document, or the following day, Archibald and other employees of ITP were escorted out of the ITP offices.  Collins and Marsh met after the Prodigy Incident (Follow-up Meeting).  At the Follow-up Meeting, Marsh provided Collins with additional, albeit incomplete, information about Prodigy.  After the Follow-up Meeting, either later that day or the following day, Archibald was permitted to reenter the ITP offices.

In January 2007, as the agreed resolution to Marsh's decision to leave ITP, Plaintiffs and Marsh negotiated a separation agreement (Marsh Separation Agreement).  The Marsh Separation Agreement terminated Marsh's employment with ITP, terminated Marsh's noncompetition agreement and the noncompetition agreements of several other  individuals.  The Marsh Separation Agreement included a provision that expressly terminated Archibald's

---

[5]Marsh testified that the controller discovered something, he thought it was "the articles of incorporation or something, or domain name, or something."

Noncompetition Obligations.  The Marsh Separation Agreement also transferred certain ITP customer accounts to Prodigy and Marsh in exchange for payments set forth in the Marsh Separation Agreement.  Marsh's Separation Agreement was signed on January 23, 2007, but back-dated to January 10, 2007.  One explanation offered, by Collins, for making the agreement effective January 10, 2007, was that on or around January 10, 2007, ITP began taking orders to produce promotional products for Prodigy.

The Marsh Separation Agreement also rescinded Marsh's January 10, 2007 resignation and withdrawal and provided that "[n]otwithstanding any provision to the contrary in that certain operating agreement dated August 1, 2002 between [Marsh] and Collins... [ITP] shall not dissolve upon the redemption of [Marsh's] right... ."  The evidence related to this provision was limited and vague.  The August 1, 2002 operating agreement was not introduced into evidence.

After Plaintiffs had entered into the Marsh Separation Agreement, Collins met with Archibald to execute Archibald's separation agreement (Separation Agreement).  The Separation Agreement released Archibald from his Noncompetition Obligations (Release) and transferred certain ITP customer accounts, set forth on an "EXHIBIT X" (X-List), to Archibald.  The Separation Agreement also had an "EXHIBIT Y" (Y-List) which were accounts retained by ITP.  Other than the X-List and Y-List, the Separation Agreement had already been drafted entirely by ITP.  Other than the X-List and Y-List, there were no negotiations between Archibald and Plaintiffs concerning the terms of the Separation Agreement.

The Separation Agreement at paragraph 6.(c) states, in part:

> (c)  Prior to execution of this Agreement, the
> company has been given a reasonable opportunity
> to review all relevant books, records and
> documents, have been supplied with all additional
> information that the Company have requested, have

had a reasonable opportunity to ask questions of
and receive answers from Archibald and all such
questions have been answered to the Company's
full satisfaction.  Furthermore, in making the
decision to sell the Archibald Accounts t[o] and
enter into this Agreement, the Company has not
relied upon any representations written or oral, from
Archibald, but has relied on its own investigation of
the Company's business and affairs and
independent advice from its legal counsel and
financial advisors.

When Archibald and Collins met to sign the Separation Agreement, Collins did not ask

Archibald if he had ever acted on behalf of Prodigy or if Archibald had violated his

Noncompetition Obligations.   Collins did not tell Archibald, or otherwise communicated to him,

that any failure to honor his Noncompetition Obligations was material to Plaintiffs' decision to

enter into the Separation Agreement.

When Archibald and Collins met to sign the Separation Agreement, Archibald did not

disclose to Collins that he had solicited the Two Orders on behalf of Prodigy or that he had ever

violated his Noncompetition Obligations.  Archibald testified that when he met with Collins to

sign the Separation Agreement he believed, because of the Prodigy Incident and discussions with

Marsh, that Collins was already aware of his involvement with Prodigy and his potential

violations of the Noncompetition Obligations.

As part of the consideration for entering into the Separation Agreement, Archibald

agreed to pay ITP $90,000 as evidenced by a promissory note ($90,000 Promissory Note).

Paragraph 1.(h) of the Separation agreement also provided that Archibald would make himself

available to train ITP personnel.  Collins testified that "we were losing our entire sales force",

and Archibald was agreeing to make himself available to train new salesmen for ITP.

6

Over the following 18 month period, Archibald made at least 11 payments of $1,000 each to ITP and negotiated a $5,000 credit to be applied toward the $90,000 Promissory Note in conjunction with the resolution of a dispute over one of the X-List customer accounts. Archibald testified that he ceased making payments to ITP on the $90,000 Promissory Note because of Archibald's belief that ITP had violated the Separation Agreement by soliciting one or more of the X-List customers. In addition, Archibald testified that at the time he ceased making payments to ITP on the $90,000 Promissory Note, Archibald was experiencing financial hardships.

Collins testified that Plaintiffs would not have entered into the Separation Agreement with Archibald if they had known that Archibald had violated his Noncompetition Obligations. Prior to January 2007, ITP had terminated at least one employee for violation of his noncompetition obligations. In 2005 or 2006, Rob Rowan (Rowan), a former sales representative and ITP worked out an arrangement (Rowan Agreement) similar to the Separation Agreement. Rowan had violated his noncompetition agreement with ITP and the Rowan Agreement permitted Rowan to continue his competitive activities notwithstanding Rowan's violation of the his noncompetition obligations.

After terminating his employment with ITP, Archibald began working for Prodigy as a sales representative. In October 2008, Archibald left Prodigy and began working as a co-owner of a company founded by James Greaves and Archibald called Brand Makers Promotional Products, LLC (Brand Makers). When Brand Makers was organized, James Greaves and Archibald each owned a fifty percent interest.

From its inception, Brand Makers suffered substantial operating losses. To offset the operating losses, Brand Makers borrowed money from Thomas Greaves who is the father of

James Greaves.  Prior to May 2009, Thomas Greaves loaned Brand Makers a total of approximately $206,000.  In May of 2009, Thomas Greaves refused to lend additional funds to Brand Makers without first obtaining a promissory note, security agreement and personal guarantees from James Greaves and Archibald.  On May 29, 2009, Brand Makers entered into a promissory note in the amount of $250,000 and security agreement in favor of Thomas Greaves (May 2009 Agreement).  James Greaves and Archibald both signed the May 2009 Agreement as guarantors.  There was no written security agreement between Archibald and Thomas Greaves. In conjunction with the May 2009 Agreement, Thomas Greaves advanced an additional $40,758 to Brand Makers.

In August of 2009, Brand Makers entered into a promissory note in the amount of $150,000 and security agreement in favor of Thomas Greaves (August 2009 Agreement).  James Greaves and Archibald both signed the August 2009 Agreement as guarantors.  After May of 2009, Thomas Greaves lent Brand Makers approximately $225,000 in additional funds.  By February 2010, Thomas Greaves had lent Brand Makers a total of approximately $471,000.

Brand Makers failed to make scheduled payments to Thomas Greaves and was in default as of September 2009.  On February 24, 2010, Thomas Greaves sent an e-mail (February 2010 E-mail) addressed to James Greaves which stated:

> I am writing this email to formalize what we have already discussed.  In our contract signed on May 29th 2009, it states that if Brand Makers in unable to make payments, I will take possession and control of 100% of the equity in the company. Brand Makers has not made a payment in 7 months so I am exercising my right as outlined in the security agreement.

Archibald testified that in February 2010, Brand Makers, James Greaves and Archibald agreed that Thomas Greaves could take over Brand Makers.  Archibald further testified that, pursuant to

this agreement, he transferred his equity interest in Brand Makers to Thomas Greaves (the
Transfer).  An "Amended and Restated Operating Agreement of Brand Makers Promotional
Products, LLC," (Amended Operating Agreement) was entered into, as of February 25, 2010 by
Thomas Greaves as the sole member of Brand Makers and James Greaves as Brand Makers
manager.  Other than the Amended Operating Agreement there is nothing documenting the
Transfer.

After February 2010, Archibald ceased taking ownership draws from the Brand Makers
account, but was paid commissions.  After February 24, 2010, Archibald continued to be
associated with Brand Makers.  He managed Brand Makers' day-to day operations, participated
in employment decisions, signed checks, assisted in payment of bills and trained sales people.
Archibald is currently a sales person for Brand Makers.

On May 7, 2010, the Fourth District Court, State of Utah entered a judgment in case no.
080402971, in favor of ITP and against Archibald in the amount of $108,983,07.  After ITP
obtained its judgment against Archibald, but before Archibald filed for bankruptcy on August
27, 2010, Archibald and James Greaves met with Collins to discuss the Judgment (Judgment
Meeting).  Collins testified, that at this meeting, it was represented to him that Archibald was
still an owner of Brand Makers and that Brand Makers owed Thomas Greaves a large sum of
money.

In response to question number 10  in Archibald's Statement of Financial Affairs filed in
his bankruptcy proceeding case no. 10-31764, Archibald disclosed a transfer to Tom Greaves.
The transfer was described as "50% interest in Brand Makers, LLC, repossessed on secured
claims for $ loaned to company."

9

## DISCUSSION

This adversary proceeding is brought by the Plaintiffs under §§ 523(a)(2)(A) and

727(a)(2) & (5).  Under both sections of the United States Bankruptcy Code, a creditor seeking

exception to discharge or denial of discharge must show, by a preponderance of the evidence,

that they are entitled to the relief sought.[6]  Exceptions to discharge under § 523 are to be

narrowly construed, and because of the fresh start objectives of bankruptcy, doubt is to be

resolved in the debtor's favor.[7]  Grounds for denying a discharge under § 727 are to be narrowly

construed.[8]

**A.      Plaintiff's Section 523(a)(2)(A) Claim.**

To establish that a debt is excepted from discharge under § 523(a)(2)(A), "... a creditor

must prove, by a preponderance of the evidence[9], the following elements:

(1) the debtor made a false representation;

(2) the debtor made the representation with the intent to deceive the creditor;

(3) the creditor relied on the representation;

(4) the creditor's reliance was [justified]; and

(5) the debtor's representation caused the creditor to sustain a loss."[10]

---

[6]*Grogan v. Garner*, 498 U.S. 279, 291 (1991) (with respect to § 523), and  *In re Serafini*, 938 F.2d 1156, 1157 (10th Cir. 1991) (with respect to § 727).

[7]*In re Kaspar*, 125 F.3d 1358, 1361 (10th Cir. 1997).

[8]*In re Kallstrom*, 298 B.R. 753, 758 (10th Cir. BAP 2003).

[9]*See Grogan v. Garner,* 498 U.S. 279, 291(1991).

[10]*In re Young*, 91 F.3d 1367, 1373 (10th Cir. 1996).  As discussed, *infra*, the Supreme Court has clarified that the proper standard is "justifiable reliance."

A failure to establish any one of these elements is fatal to the creditor's claim.  Based on the

Factual Findings set forth above, the Court concludes that Plaintiffs have failed to establish any

of the requisite § 523(a)(2)(A) elements.

    **1.  Plaintiffs Have Failed to Establish a False Representation.**  The Plaintiffs'

§ 523(a)(2)(A) action is based upon the assertion that Archibald failed to disclose the fact that he

had violated his Noncompetition Obligations by soliciting the Two Orders,[11] and if Archibald

had disclosed this fact, Plaintiffs would not have entered into the Separation Agreement.  Failure

to disclose information may constitute a false representation or false pretenses under

§ 523(a)(2)(A).[12]

    When determining exceptions to discharge under § 523(a)(2)(A), bankruptcy courts look

to the concept of actual fraud as it was understood in 1978.[13]  "Then, as now, the most widely

accepted distillation of the common law of torts was Restatement (Second) of Torts (1976). "[14]

(Restatement).  Restatement (Second) of Torts (1976) (Restatement) § 551 addresses liability for

nondisclosure.  The applicable portion of § 551[15] states –

    § 551 Liability for Nondisclosure

---

[11]Plaintiffs also alleged that Archibald had no intention of paying his debt under the
Separation Agreement at the time he signed it, but failed to introduce any significant evidence
with respect to this allegation.

[12]*Young* at 1374.

[13]*Field v. Manns,* 516 U.S. 59, 70 (1995).

[14]*Id.*

[15]Restatement § 551(2)(b),(c) and (d) are not applicable.  Clause (b) applies when a
partial or ambiguous statement give rise to a duty while clauses (c) and (d) apply when
subsequently acquired information creates a duty to disclose.

(1) One who fails to disclose to another a fact that he *knows* may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,
    (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and

    . . . .

    (e) facts basic to the transaction, if he *knows* that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

(emphasis added).  If there is no duty of disclosure there is no liability for nondisclosure.[16]  A

person under a duty to disclose "is required to disclose only those matters that he *knows* will be

regarded by the other as important in determining his course of action in the transaction at

hand."[17]

Analysis of a claim for nondisclosure is essentially a two step analysis.  First, was there a

duty to disclose, and second, if there was a duty to disclose, did the nondisclosing party fail to

disclose a fact that he *knew* may justifiably induce the other party to act with respect to the

transaction to be consummated.

**a. Archibald's duty to disclose.**

While the Restatement provides a distillation of the common law relating to the duty to

disclose, as the Utah Supreme Court has noted,

_____

[16]Restatement § 551 cmt. a (1976).

[17]*Id.* cmt. c (emphasis added).

12

> . . . except in broad terms the law does not attempt to define the occasions when a duty to speak arises.  On the contrary, there has been adopted, as a leading principle, the proposition that **whether a duty to speak exists is determinable by reference to all the circumstances of the case and by comparing the facts not disclosed with the object and end in view by the contracting parties**.  The difficulty is not so much in stating the general principles of law, which are pretty well understood, as in applying the law to particular groups of facts.[18]

The Court must look at the totality of the circumstances of this case and compare the facts not disclosed with the object and end in view by Plaintiffs and Archibald to determine whether there was a duty to disclose.

The evidence shows that the Separation Agreement was only one of several similar agreements entered into between Plaintiffs and ITP salesmen, most notably Marsh, in an effort to minimize the economic impact ITP was facing from the loss of its sales force.  Collins was put on inquiry notice of the possibility that some, or all, of the ITP salesmen were involved with, and had performed work for, Prodigy prior to January 23, 2007.  Collins was put on notice at the Luncheon Meeting that Prodigy was an entity that would be affiliated with Marsh.  Collins further put on inquiry notice regarding possible violations of noncompetition obligations by ITP salesmen as a result of the Prodigy Incident and the Follow-Up Meeting with Marsh.  Collins was put on actual notice that Prodigy was in existence prior to signing the Separation Agreement.[19]   Plaintiffs knew of Prodigy's activities because ITP agreed to perform contract services beginning January 10, 2007 for orders Prodigy had already solicited.  Notwithstanding this knowledge, Plaintiffs did not seek to enforce any noncompetition agreements but elected to enter into separation agreements releasing the salesmen from liability.

---

[18]*Elder v. Clawson,* 384 P.2d 802, 804 (Utah 1963) (emphasis added).

[19]The Marsh Separation Agreement, which was signed prior to the Separation Agreement, clearly identifies Prodigy as a party to the agreement.

Enforcement of the noncompetition agreements would have resulted in the loss of ITP salesmen.  Plaintiffs presented no evidence that enforcing the noncompetition agreements, particularly Archibald's, would have resulted in any benefit or recovery of any damages that may have resulted from the salesmen's violation of their noncompetition agreements.  Because the separation agreements provided for the sale of customer accounts and the promise of future production work the separation agreements provided an economic benefit to ITP.  Plaintiffs' election to enter into the separation agreements makes economic sense.  Their choices were to enforce the noncompetition agreements, which would mean possible elimination of ITP's sales force and recovery of little if any damages, or enter into new agreements that provided more economic benefit by receiving value for the accounts sold and the promise of business revenue from future production orders.  The inference the Court draws from this evidence is that the object and end in view of Plaintiffs and Archibald was not the enforcement of the Noncompetition Obligations but was rather the termination of the Noncompetition Obligations, the sale of customer accounts to Archibald and Archibald's agreement to have ITP perform his production work.

Plaintiffs have failed to establish a duty to disclose under Restatement § 551(2)(a). Plaintiffs argue that Archibald's employment contract  containing the Noncompetition Obligations established a relationship of trust and confidence, forged over a period of years. Although not expressly stated, Plaintiffs seem to assert that this relationship of trust and

confidence created a fiduciary relation[20] and therefore gives rise to a duty to disclose.[21]  Plaintiffs

argue that because Archibald was bound by an employment agreement containing the

Noncompetition Obligations, "Archibald had a duty to ITP to 'exercise the utmost good faith,

loyalty, and honesty toward [ITP], to act solely for the benefit of the [sic] [ITP] in all matters

connected with the relationship, and to refrain from any self-dealing transactions which had the

potential to benefit the [sic] Archibald at the expense of ITP.'"

Plaintiffs did not introduce any written employment or noncompetition agreement into

evidence so the court can only rely on the testimony heard at trial.  The testimony is that

Archibald was a salesman for ITP.  For purposes of its analysis, the Court will assume that, as a

salesman, Archibald acted as an agent for ITP and had a duty to disclose information relevant to

the matter entrusted to him, namely sales.  The court will also assume that Archibald's

solicitation of ITP customers for another entity is information relevant to the matter entrusted to

him and he had a duty under his employment agreement to disclose the Two Orders.

But, the issue before the Court is not Archibald's employment agreement and alleged

breach of his duty as a salesman/agent for ITP, but rather it is the Separation Agreement and

matters relating to the negotiation of the Separation Agreement.  Was Archibald negotiating in a

fiduciary relation with respect to the Separation Agreement?  The answer is no.  "Such a

confidential relationship' may be found where '(1) one party has taken steps to induce another to

believe that it can safely rely on the first party's judgment or advice; (2) one party has gained the

---

[20]The court is not analyzing fiduciary relationship under  § 523(a)(4), which pursuant to
*Fowler Brothers v. Young (In re Young)*, 91 F.3d 1367, 1371 (10th Cir. 1996) requires an express
or technical trust to establish a fiduciary relationship.

[21]Restatement § 551(2)(a).

15

confidence of the other and purports to act or advise with the other's interest in mind; or (3) the

parties' relationship is such that one is induced to relax the care and vigilance that ordinarily

would be exercised in dealing with a stranger.'"[22]

Without any additional factual basis, Plaintiffs seek to extend any duty Archibald may

have had as a salesman/agent to his negotiation of the Separation Agreement.  Plaintiffs

introduced no evidence to show that Archibald had taken any steps to induce Plaintiffs to believe

that they could rely on his advice with respect to the Separation Agreement, that he was acting or

advising them with their interests in mind, or that he induced them to relax the care and vigilance

that they would normally exercise.  In fact, paragraph 6.(c) of the Separation Agreement

disavows that Archibald was looking after Plaintiff's interests or inducing them to relax their

vigilance.  "[O]ne may not abandon all caution and responsibility for his own protection and

*unilaterally* impose a fiduciary relationship on another without a conscious assumption of such

duties by the one sought to be held liable as a fiduciary."[23]  In light of Archibald's suspected

involvement with Prodigy, Plaintiff's express waiver of any reliance on Archibald's

representations and their assumption of the risk of investigation of facts, Plaintiff's can not now

unilaterally impose a fiduciary duty on Archibald.

Plaintiffs have also failed to establish a duty to disclose under Restatement § 551(2)(e).

The Comment on Clause (e) in Restatement § 551 states -

> A basic fact is a fact that is assumed by the parties as a basis for the transaction
> itself.  It is a fact that goes to the basis, or essence, of the transaction, and is an

---

[22]*Ryan v. Blatzer* 438 B.R. at *5 (10 Cir. BAP 2010) (table decision).

[23]*Denison State Bank v. Madoria,* 640 P.2d 1235, 1243-44 (Kan. 1982) (emphasis added), *LNS Investment Company, Inc. V. Phillips 66 Co.,* W.L. No. 87-2215-0, 1989 WL 10367, at *4 (D. Kan. August 29, 1989) (quotation omitted).

16

important part of the substance of what is bargained for or dealt with.  Other facts
may serve as important and persuasive inducements to enter into the transaction,
but not go to its essence.  These **facts may be material, but** they are **not basic.
If the parties expressly** or impliedly **place the risk as to the existence of a fact
on one party** or if the law places the risk as to the existence of a fact on one party
or if the law places it here by custom of otherwise **the other party has no duty of
disclosure**.  (Compare Restatement, Second Contracts § 296).[24]

Plaintiffs cannot rely on Restatement § 551(2)(e) for two reasons.  First and foremost, pursuant to

paragraph 6.(c) of the Separation Agreement, Plaintiffs expressly placed the risk as to the

existence of facts on themselves.  Restatement § 551(2)(e) would not excuse any

misrepresentations made by Archibald in response to questions, but he had no duty to disclose

because Plaintiffs assumed the risk as to the existence of facts.

Secondly, Archibald's adherence to his Noncompetition Obligations was not a basic, as

opposed to material, fact that went to the essence of the Separation Agreement. The Comment on

Clause (e) clarifies that facts may be material, but not be basic.  Materiality clearly relates to

liability for nondisclosure[25] but it does not create a duty to disclose.

The Separation Agreement contains two recitals which reveal the essence of the

Separation Agreement.  The Recitals in the Separation agreement state: "A. Archibald's

employment with the Company has been Terminated.  B. Archibald desires to obtain certain

rights with respect to certain customers of the Company, and the Company desires to grant such

rights upon the terms and conditions of the Agreement."  At the time the Separation Agreement

was signed, Archibald had been terminated.  The essence of the agreement was to transfer certain

rights to Archibald in exchange for payment.  Plaintiff's had, at a minimum, a suspicion the

---

[24]Restatement (Second) of Torts § 551 cmt. j. (1976) (emphasis added.).

[25]Materiality also relates to justifiable reliance as discussed in more detail *infra.*

17

Archibald had violated his Noncompetition Obligations but did not elect to pursue enforcement of the Noncompetition Obligations. The fact that Plaintiffs would like to have known that Archibald had violated his Noncompetition Obligations and, as they allege, would not have entered into the Separation Agreement had they known this fact, may make the fact material, but does not make the fact a basis for the Separation Agreement.

Even if Archibald's adherence to his Noncompetition Obligations was a basis for the Separation agreement, Plaintiffs have failed to prove Archibald knew they were entering into the Separation Agreement under a mistaken belief that he had not violated his Noncompetition Obligations. Archibald knew that Plaintiffs and Marsh were negotiating Marsh's separation from ITP. During these negotiations, Plaintiff's became aware of Prodigy and as a result, Archibald was escorted from ITP's business premises but was allowed to return after Marsh met with Collins. In light of the Plaintiffs' reaction to the Prodigy Incident it was reasonable for Archibald to believe that Plaintiffs, at least, suspected he had violated his Noncompetition Obligations. Notwithstanding these facts, Plaintiffs still desired to enter into the Separation Agreement. Not only did Plaintiffs fail to present evidence that Archibald knew they were mistaken about adherence to his Noncompetition Obligations, Archibald testified that he believed Plaintiffs knew he had not honored his Noncompetition Obligations.

Plaintiffs have failed to prove by a preponderance of the evidence that there was a fiduciary or other similar relation of trust and confidence between them and Archibald with respect to the Separation Agreement. Plaintiffs have also failed to prove by a preponderance of the evidence that Archibald *knew* Plaintiffs were entering into the Separation Agreement under a mistake as to a fact basic to the Separation Agreement. Consequently, Plaintiffs have failed to establish that Archibald had a duty to disclose his solicitation of the Two Orders.

18

**b. Archibald's knowledge of the materiality of his solicitation of the Two Orders.**

Even assuming Archibald had a duty to disclose, he was only required to disclose those matters he *knew* Plaintiff's regarded as important in determining their course of action with respect to the Separation Agreement.[26]  A party can be liable for nondisclosure of a material fact only if the party has knowledge of the fact and its materiality.  Because a party cannot be liable for nondisclosure of a fact that he does not know is material, he obviously cannot be liable for failure to disclose of a fact that is not material.  Not only was there no reason for Archibald to know that his solicitation of the Two Orders was material to Plaintiff's decision to enter into the Separation Agreement, the evidence shows that it was not material.

Plaintiffs failed to prove by a preponderance of the evidence that Archibald *knew* that his solicitation of the Two Orders was material to Plaintiffs' decision to enter into the Separation Agreement.  Much of the same evidence that lead this Court to conclude that Archibald didn't know that Plaintiffs were mistaken about his adherence to his Noncompetition Obligations also leads the Court to conclude that Archibald didn't know this fact was material.

In particular, Plaintiffs' reaction to the Prodigy Incident was reason for Archibald to believe that Plaintiffs, at least, suspected he had violated his Noncompetition Obligations. Notwithstanding this fact, Plaintiffs still desired to enter into the Separation Agreement. Additionally, Plaintiffs had no discussions with Archibald until the signing of the Separation Agreement.  While negotiating[27] the Separation Agreement, Plaintiffs never informed Archibald that any violation of his Noncompetition Obligations was important to them and never asked a

---

[26]Restatement § 551(1) and cmt a.

[27]The court uses the term "negotiating" very loosely because the evidence shows there was virtually no negotiation.

question regarding the same.  Because the purpose of the Separation Agreement was not to enforce Archibald's Noncompetition Obligations, and Plaintiffs never informed Archibald that any violation of his Noncompetition Obligations was important to them and they asked no questions about potential violations of the Noncompetition Obligations, it was reasonable for Archibald to conclude that his solicitation of the Two Orders was not important to Plaintiffs.  Consequently, Plaintiffs have failed to establish that Archibald *knew* they regarded violations of his Noncompetition Obligations as important in determining their course of action with respect to the Separation Agreement.

Not only was it reasonable for Archibald to conclude that his solicitation of the Two Orders was not material, the evidence also shows that Archibald's solicitation of the Two Orders was not material to Plaintiffs' decision with respect to the Separation Agreement.  It was important to Plaintiffs that ITP salesmen honor their non-compete agreements and it was material to their continued employment with ITP.  However, the issue in this case is not Archibald's continued employment with ITP, but is Archibald's separation from ITP.  The evidence is that ITP had, on at least one occasion, entered into an agreement similar to Archibald's Separation Agreement, with a former salesman notwithstanding the former salesman's violation of his noncompetition agreement.  Although Collins testified that Archibald's adherence to the Noncompetition Obligations were of great importance and materiality, his actions at the time of the Separation Agreement show otherwise.  Prior to any discussions with Archibald, Plaintiffs were willing to terminate Archibald's Noncompetition Obligations as evidenced by the Marsh Separation Agreement stating that Archibald's Noncompetition Obligations were "terminated and cancelled and of no further force or effect."  Prior to meeting with Archibald, all terms of the Separation Agreement, other than the X-List and Y-List, had been reduced to writing.

20

The doubtful materiality of Archibald's solicitation of the Two Orders is further highlighted by the fact that Plaintiff's didn't ask Archibald a single question about possible violations of his Noncompetition Obligations.  Archibald would not have been escorted from the ITP business offices had the management of ITP not, at least, suspected that Archibald was somehow involved with Prodigy[28] and had violated his Noncompetition Obligations.  Even though Plaintiffs expressly placed the risk as to the existence of facts on themselves, had knowledge that Prodigy was in existence and operating prior to January 10, 2007 and, at a minimum, suspected Archibald was involved with Prodigy, Plaintiffs never asked a single question, or informed Archibald, about this matter that was allegedly so important to them.

In sum, the evidence shows that: (1) ITP had, on at least one occasion, entered in an agreement similar to Archibald's Separation Agreement with an employee that had violated his noncompetition agreement, (2) Plaintiff's were willing to terminate Archibald's Noncompetition Obligations before talking to Archibald, (3) notwithstanding an express provision in a contract prepared by Plaintiffs and their knowledge of potential violations of Archibald's Noncompetition Obligations, failed to ask Archibald a single question about this allegedly material fact, and (4) Plaintiffs never told Archibald that any breach of his Noncompetition Obligations was material to them.

Plaintiffs have failed to prove by a preponderance of the evidence that Archibald knew that any breach of his Noncompetition Obligations was material to Plaintiffs.  In fact, the

---

[28]Although Collins testified that he had no recollection of ordering that Archibald be escorted from the ITP business offices, Collins offers no explanation of why Archibald would be escorted from the ITP offices after the controller's discovery of a Prodigy related document. Absent any other explanation, the only reasonable conclusion is that Collins believed that Archibald was somehow involved in Prodigy's activities in violation of his non-compete agreement.

preponderance of the evidence shows Archibald's breach of his Noncompetition Obligations was not material to Plaintiffs.  Consequently Archibald's failure to disclose his solicitation of the Two Orders does not constitute a false representation of a material fact.

 **2. Plaintiffs Have Failed to Establish An Intent to Deceive.**  Even if Archibald's failure to disclose that he had solicited the Two Orders in violation of his Noncompetition Obligations was a false representation of a material fact, Plaintiffs have failed to establish that Archibald failed to disclose this fact with the intent to deceive.  Plaintiffs place great emphasis on Archibald's failure to disclose, arguing that this failure evidences dishonesty and Archibald's fraudulent intent.  While the court is not condoning Archibald's actions, and recognizes that an intent to deceive may be inferred from the totality of the circumstances,[29] failure to disclose, by itself, does not establish the requisite intent to deceive.  A creditor must show that the debtor failed to disclose material facts, with an intent to deceive in direct connection with the transaction.[30]

 Intent is a "determination to act in a certain way or to do a certain thing."[31]  As the Tenth Circuit Bankruptcy Appellate Panel has stated, "the touchstone to a finding of intent to deceive is the speaker's actual subjective state of mind– *i.e.,* the speaker's actual knowledge and belief – at the time the misrepresentation is made."[32]  While Restatement § 551(1) addresses the nondisclosing parties knowledge of materiality of an undisclosed fact, the relying party must also

---

[29]*Riebesell*, at 791.

[30]*In re Davis*, 246 B.R. 646, 652 (10th Cir. BAP 2000)(*Affirmed in part, vacated and remanded in part on other grounds, 2002 WL 1044832*).

[31]Black's Law Dictionary.

[32]*DSC National Properties LLC v. Johnson*. No. 11-105, 2012 WL 3399614, at *9 (BAP 10th Cir. August 15, 2012).

show that the nondisclosing party intended, or was determined to not disclose a material fact *with an intent to deceive*.  In any business transaction, there are virtually an unlimited number of undisclosed facts.  If the nondisclosing party does not know that an undisclosed fact is important or material to the other party, or that the other party is relying on the nonexistence of the fact, the nondisclosing party can not form the requisite intent to not disclose the fact.

Plaintiffs have failed to establish Archibald's intent, because, as discussed above, they have failed to establish that Archibald knew that they regarded his adherence to his Noncompetition Obligations as material in making their decision to enter into the Separation Agreement.  Plaintiffs did solicit testimony from Archibald that his solicitation of the Two Orders was information Plaintiffs would like to know, but that is different than testimony that he knew his solicitation of the Two Orders was material to Plaintiffs' decision to enter into the Separation Agreement.  In fact Archibald's testimony was that he thought Plaintiffs knew, or at least suspected, that he had violated his Noncompetition Obligations.  Even if Archibald knew that any violation of his Noncompetition Obligations was material, his belief that Plaintiffs already knew he had potentially violated them, evidences his lack of interest to deceive.

Given all of the facts and circumstances discussed above, it was reasonable for Archibald to conclude that Plaintiffs knew of his activities related to Prodigy and that those activities were not material to the Plaintiffs' decision to enter into the Separation Agreement.  Based on the totality of the circumstances, the Court can not infer that Archibald had an intent to deceive Plaintiffs by not disclosing the Two Orders.

**3. Plaintiffs Have Failed to Establish Actual Reliance.**  Proving that a creditor actually relied is a separate and distinct element of § 523(a)(2) and must be proven by the creditor even where an exceptionally strong showing is made that the debtor made false representations with

the intent to deceive.[33]  Reliance may be proven by circumstantial evidence.  The court must

determine a creditor's reliance based upon the facts and circumstances present in the particular

case and not based upon industry standards.[34]

Plaintiff's have not introduced any facts, let alone proved, that they relied on anything

Archibald said or didn't say.  Absent any discussions with Archibald, the Marsh Separation

Agreement released Archibald from his Noncompetition Obligations.  Absent any discussions

with Archibald, Plaintiffs caused the Separation Agreement to be prepared and the Separation

Agreement disavows any actual reliance.  In light of the above, any argument that the Plaintiffs

actually relied upon a nondisclosure by Archibald prior to entering into the Separation Agreement

is without merit.

**4.  Plaintiffs Have Failed to Establish Justified Reliance.**  The standard for excepting a

debt from discharge as a fraudulent representation within the meaning of §523(a)(2)(A) is not

reasonable reliance but the less demanding one of justifiable reliance.  Even under the justifiable

reliance standard, "a person is required to use his senses, and cannot recover if he blindly relies

upon a misrepresentation the falsity of which would be patent to him if he had utilized his

opportunity to make a cursory examination or investigation."[35]  Justifiable reliance does not apply

"where, under the circumstances, the facts should be apparent to one of his knowledge and

intelligence from a cursory glance, or he has discovered something which should serve as a

warning that he is being deceived, that he is required to make an investigation of his own.[36]  In

---

[33]*In re Mullet*, 817 F.2d 677 (10th Cir. 1987).

[34]*In re Cribbs*, 327 B.R. 668 (10th Cir. BAP 2005).

[35]*Field v. Mans*, 516 U.S. 59, 71 (1995).

[36]*Id.*, at 71.

determining whether a creditor's reliance was justifiable, a court should examine the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than applying a community standard of conduct to all cases.[37]

As stated previously, Plaintiffs were on inquiry notice of the possibility that Archibald was involved and performing work for Prodigy prior to January 23, 2007.  Inquiry notice occurs when circumstances arise that should put a reasonable person on guard so as to require further inquiry on his part."[38]  "Whatever is notice enough to excite attention and put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led.  When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it."[39] Even under a "justifiably relied" test, the plaintiff must use his senses and at least make a cursory examination or investigation of the facts of the transaction before entering into it.[40]

In addition to inquiry notice, the facts are that Collins had actual notice that Archibald was involved with Prodigy prior to entering into the Separation Agreement.  It is undisputed that Collins entered into the Marsh Separation Agreement prior to entering into Archibald's Separation Agreement.  Paragraphs 4. and 5. Of the Marsh Separation Agreement expressly recognized the existence of Prodigy and expressly recognized an affiliation of Archibald with Prodigy.  The Marsh Separation Agreement put Collins on actual notice of Archibald's affiliation with Prodigy prior to Collins entering into the Separation Agreement with Archibald.

---

[37]*In re Riebesell*, 586 F.3d 782, 792 (10th Cir. 2009).

[38]*First American Title Insurance Co v. J.B. Ranch, Inc.*, 966 P.2d 834, 838 (Utah 1998)(*citation omitted).

[39]*Salt Lake, G. & W. Ry. Co. V. Allied Materials Co.*, 291 P.2d 883, 885 (Utah 1955)(*quoting O'Reilly v. McLean,* 37 P.2d 770, 775 ) (1934).

[40]*Riebesell*, at 792.

If, as Plaintiffs argue, Archibald's breach of his noncompetition agreement was material, they clearly had knowledge of facts that should have excited attention and lead to some investigation on their part.  Not only did Plaintiffs have knowledge of the facts that should have lead to some investigation, paragraph 6.(c) of the Separation Agreement obligated them to conduct heir own investigation.  It is undisputed that Archibald made no disclosure of his activities, but Plaintiffs offered no evidence that, given the information they had and the obligation they had assumed, they made even a cursory examination or investigation of the facts material to them.  Any reliance on Archibald's nondisclosure is therefore not justified.

**5.  Actual Loss.**  Plaintiffs rely on the Separation Agreement to support their claim of loss.  The Separation Agreement calls for payment of $90,000 according to the terms of a promissory note attached as Exhibit A.  Plaintiffs argue that the X list customers had a minimum value to ITP of $90,000.  Although the Court believes the Plaintiffs' calculation of loss is reasonable, the loss must be caused by Archibald's fraud or false representation to be excepted from discharge under § 523(a)(2)(A).  Because Plaintiff's have failed to establish Archibald's fraud or false representation, there can be no resulting damages.

**B.  Plaintiffs' Section 727 Claims.**

Plaintiffs seek denial of Archibald's discharge under 11 U.S.C. § 727(a)(2) & (5) and argue that Archibald, with intent to hinder, delay or defraud a creditor, namely Plaintiffs, transferred property within one year of the petition date and that Archibald failed to satisfactorily explain the loss of assets or deficiency of assets.  The Plaintiffs' allegations with respect to the § 727 claims are focused entirely on Archibald's equity interest in Brand Makers.

**1.  Plaintiff's Section 727(a)(2) Claim.**  To obtain a denial of discharge under §727(a)(2)(A), a plaintiff must prove: 1) that a transfer of property occurred; 2) that the debtor

26

owned the property transferred; 3) that the transfer occurred within one year of filing the petition; and 4) that the debtor had, at the time of the transfer, the intent to defraud a creditor.[41]  To deny a discharge under § 727(a)(2), a court must find actual intent to defraud creditors.[42]  The Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor.[43]

Because showing direct evidence of actual intent can be difficult, "fraudulent intent to conceal assets may be established by circumstantial evidence, or by inferences drawn from the course of conduct."[44]  Actions from which fraudulent intent may be inferred include situations in which a debtor: conceals prebankruptcy conversion of nonexempt assets to exempt assets; converts nonexempt assets to exempt assets immediately before the filing of the bankruptcy petition; gratuitously transfers property; continues to use transferred property; and, transfers property to family members.[45]  Courts also consider the monetary value of the asset.[46]  Other indicia of fraud include: obtaining credit to purchase exempt property; conversion of property after entry of a large judgment against the debtor; the debtor had engaged in a pattern of sharp

---

[41]*In re: Seay*, 215 B.R. 780, 788-89 (10th Cir. BAP 1997).

[42]*In re Warren*, 512 F.3d 1241, 1249 (10th Cir. 2008), *Marine Midland Bus. Loans, Inc. v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991).

[43]*In re Brown*, 108 F.3d 1290, 1292 (10th Cir. 1997).

[44]*Farmers Co-op Assoc. of Talmage, Kansas v. Strunk*, 671 F.2d 391, 395 (10th Cir. 1982).

[45]*Marine Midland Business Loans v. Carey (In re Carey)*, 938 F.2d 1073, 1077 (10th Cir. 1991).

[46]*Id.*

dealing prior to bankruptcy; the conversion of the asset rendered the debtor insolvent.[47]  "The cases, however, are peculiarly fact specific, and the activity in each situation must be viewed individually."[48]

Plaintiffs' position is that the Transfer was a sham transaction only designed to hinder, delay or defraud them.  Plaintiffs argue that Archibald's fraudulent intent should be inferred because the evidence supports a finding of the following multiple indicia of fraud: (1) the transfer occurred immediately before Archibald filed his bankruptcy petition; (2) the transfer was gratuitous; (3) Archibald continued to use the transferred asset; (4) the transfer was to a family member; (5) the transfer occurred after entry of a large judgement; (5) Archibald engaged in a pattern of sharp dealing prior to bankruptcy; (6) Archibald became insolvent as a result of the transfer; and, (7) the asset transferred was valuable.

Contrary to the Plaintiffs' assertions, after careful consideration of the evidence, and viewing the specific facts that are peculiar to this case and the activity in each situation, the Court can not conclude that Archibald transferred his property with actual intent to hinder delay or defraud a creditor. Plaintiffs have failed to establish even one of the alleged indicia of fraud and their list of indicia is simply an attempt to convince the Court there is something where there is nothing.[49]  The evidence Plaintiffs introduced on their § 727(a)(2) claim is not only unsubstantial and confusing but is potentially contradictory.  The Court finds it particularly interesting that

---

[47]*Id.* at note 4.

[48]*Id.*

[49]Idioms like "where there is smoke there is fire" and "everything but the kitchen sink" come to mind.

Plaintiffs place so much emphasis on the lack of formality and documentation with respect to the Transfer - the suggestion being that there was no transfer.  If there was no transfer of Archibald's ownership interest in Brand Makers, then both the § 727(a)(2) and the § 727(a)(5) claims must fail.

What the evidence clearly shows is that Brand Makers was founded by Archibald and James Greaves.  Brand Makers operated at a substantial loss and Thomas Greaves loaned a very significant amount of money to Brand Makers.  Brand Makers entered into promissory notes and security agreements with Thomas Greaves which were personally guaranteed by Archibald and James Greaves.  Brand Makers failed to make payments to Thomas Greaves.

The evidence is less clear on what transpired after Brand Makers failed to make payments to Thomas Greaves.  Thomas Greaves sent the February 2010 E-mail addressed to James Greaves which stated that the e-mail was to formalize his taking possession and control of 100% of the equity in Brand Makers and that Thomas Greaves was exercising his right as outlined in the security agreement. There is no evidence that Thomas Greaves ever formally foreclosed on Brand Maker's assets or Archibald's equity interest.  Thomas Greaves has never asserted any deficiency with respect to the Brand Makers debt.  In his Statement of Affairs, Archibald disclosed that he had transferred his equity interest is Brand Makers to Thomas Greaves, but there is no documentation regarding the Transfer.

Archibald did not receive ownership draws after February 2010 but was paid as an employee/independent contractor.  The evidence does not show that after February 24, 2010, Archibald exercised control over Brand Makers.  Significantly, he lost the ability to receive draws

from Brand Makers, he lost his ability to hire and fire employees, and he lost the ability to guide

the direction of Brand Makers.

Plaintiffs place great emphasis on the fact that Thomas Greaves loaned Brand Makers

significant sums of money before the promissory note, security agreement and personal

guarantees were signed and that there is no document evidencing Archibald's pledge of his equity

interest in Brand Makers to Thomas Greaves.  However, Plaintiffs have produced no evidence to

contradict the fact the Archibald agreed that Thomas Greaves would be entitled to his equity

interest if Brand Makers defaulted on its obligation to Thomas Greaves.  Improper documentation

of an agreement may create issues related to enforceability, but it does not negate actions taken

pursuant to agreement.

The first indicia of fraud the Court will address is Plaintiffs' assertion that Archibald

continued to use his equity interest in Brand makers after the Transfer.  The only evidence that

Plaintiffs have introduced to support their contention is that, after the Transfer, Archibald held

himself out as a founder of Brand Makers, has remained employed by Brand Makers, was Brand

Makers' Rule 30(b)(6) designee, has acted as a representative of Brand Makers, was Brand

Makers head salesman, was authorized to sign checks, and he assisted in management.  It is true

that if an individual transfers an asset or ownership interest but then continues to exercise

dominion over it, fraud can be inferred.[50]  Unfortunately for Plaintiffs, the foregoing facts are not

inconsistent with an employee's duties and do not necessarily evidence that Archibald remained

an owner of Brand Makers after February 2010 or that he used, controlled any equity interest in

Brand Makers or that he exercised dominion or control over Brand Makers.  It is an unwarranted

---

[50]*Brown*, at 1293.

leap to infer fraud anytime a person transfers an equity interest in an entity but continues to be employed by the entity.

Not only are the foregoing facts consistent with Archibald's transfer of his equity interest to Thomas Greaves but the additional evidence supports the conclusion that the transfer of Brand Makers to Thomas Greaves was not a sham and is more probable than Archibald's continued control over his equity interest.  Thomas Greaves was a substantial creditor of Brand Makers. There was an agreement between Archibald, James Greave and Thomas Greaves that if Brand Makers failed to repay Thomas Greaves as agreed, then Thomas Greaves would be entitled to take control of Brand Makers.  The evidence also shows that the Transfer was more in the nature of an involuntary transfer.  It was initiated by Thomas Greaves, who at the time was a creditor that was owed a substantial sum of money.  The evidence is that Thomas Greaves sent the February 2010 E-mail announcing that he was taking control of Brand Makers to enforce the promissory note and security agreement.

Plaintiffs take issue with the lack of formality with respect to the transfer of Brand Makers to Thomas Greaves.  The lack of formality is only one factor to consider when looking at the totality of the circumstances.  The formality of the Transfer may raise a multitude of issues unrelated to this lawsuit, but the Court finds those issues are of little importance in this case.

Another badge of fraud the Plaintiffs argue is that the transfer of Archibald's equity in Brand Makers was largely gratuitous.  The Court finds this argument baffling.  The uncontroverted evidence is that Brand Makers owed Thomas Greaves a lot of money and Archibald had personally guaranteed that debt.  In an effort to secure desperately needed financing for Brand Makers, in addition to guaranteeing the promissory note, Archibald  agreed

31

that his equity interest would severe as collateral for Thomas Greaves. Even absent any prior agreement, a transfer of an asset in satisfaction of significant debt is not gratuitous. The Transfer may lack documentation or formality, or even be preferential, but it is not gratuitous.

Plaintiffs attempt to make an issue of the fact that there is no written security agreement with respect to Archibald's equity interest in Brand Makers. In the context of this § 727(a)(2) action and looking at the totality of the circumstances, the Court finds this fact to be unimportant. The issue before the court is not the enforceability of the agreement between Archibald, James Greaves and Thomas Greaves, or even whether the transfer was an avoidable transfer, but whether the transfer of Archibald's equity in Brand Makers to Thomas Greaves was a transfer by Archibald with intent to hinder, delay or defraud a creditor. Failure to properly document an agreement by itself does not evidence actual intent to defraud.

Further the transfer of Brand Makers to Thomas Greaves is not only consistent with the parties agreement but consistent with well established law. Thomas Greaves was a substantial creditor of Brand Makers and, in an orderly liquidation, would be entitled to be paid from Brand Makers before Archibald or Archibald's creditors. The agreement to transfer Brand Makers to Thomas Greaves might have been a preferential transfer with respect to Brand Maker creditors, but the evidence does not show it was a fraudulent transfer with respect to Archibald's creditors.

The next indicia of fraud the Court will address is the value of Archibald's equity interest in Brand Makers. The uncontroverted evidence is that Brand Makers was deeply in debt, unable to support itself and unable to make payments to it largest creditor. Absent any other evidence, the Court can conclude that Archibald's equity interest in Brand Makers was of little or no value. There is no other evidence of value. Plaintiffs argue that because Thomas Greaves deems Brand

32

Makers' debts satisfied, there is an implied value of Archibald's interest in Brand Makers of at least $200,000. The Court sees no such implication. That fact that Thomas Greaves may at this time, deem Brand Makers' debts satisfied, is not evidence of value at the time Thomas Greaves took over Brand Makers. Thomas Greaves may deem Brand Makers' debt satisfied because he received control and ownership of Brand Makers in exchange for the debt. Archibald's interest in Brand Makers was of little value, and the transfer of an asset of little or no value provides little evidence of intent to hinder, delay or defraud a creditor.

The next indicia of fraud the Plaintiffs' argue is Archibald's pattern of sharp dealing as evidenced by the Judgment Meeting and the timing of the Transfer. Sharp dealing is not a specifically defined term but is generally viewed as "unethical action and trickery."[51] Even if Archibald and James Greaves represented to Collins at the Judgment Meeting that Archibald was an owner of Brand Makers and that Brand Makers owed Thomas Greaves a substantial debt, Plaintiffs have offered no evidence or even an argument, that such a misrepresentation caused Plaintiffs to be hindered, delayed or defrauded in any way and have not articulated any advantage Archibald would have gained from such a misrepresentation. If Archibald had disclosed that he no longer held an interest in Brand Makers then what? How would Plaintiffs be better off if Archibald had disclosed the Transfer? What benefit did Archibald obtain by not disclosing the Transfer? Plaintiffs do not address any of these questions.

Plaintiffs also argue that "the timing of the transfer of Archibald's interest in Brand Makers is suspect and evidences a pattern of sharp dealing." The timing, Plaintiffs argue, is suspect because Brand Makers never made a payment to Thomas Greaves and had been in default

---

[51]*In re Sissom,* 366 B.R. 677, 700 (Bkrtcy. S.D. Tex. 2007).

for five months.  They also argue that Thomas Greaves has not asserted a deficiency or executed

on Brand Makers' property.[52]  From this evidence, the Court can not conclude that Archibald

engaged in "sharp dealing."  What the Court can conclude, is that the evidence does not establish

a "pattern" and Plaintiffs have failed to show that Archibald engaged in a "pattern of sharp

dealing."

    The remaining indicia of fraud that the Plaintiffs argue can be addresses more summarily.

The Transfer was not to a family member,[53]  was not after a large judgment,[54]  and did not occur

immediately before the petition date.[55]

    Plaintiffs have not met their burden under § 727(a)(2) to prove by a preponderance of the

evidence that the Transfer was made with an intent to defraud Archibald's creditors.

    **2.  Section 727(a)(5).**  As to the § 727(a)(5) count, the party objecting to a debtor's

discharge under § 727(a)(5) has the burden of proving facts establishing that a loss or shrinkage

of Archibald's  assets actually occurred.[56]  Plaintiffs have failed to show that a loss or shrinkage

of assets actually occurred.  Based upon the sizable and persistent operating losses experienced by

---

[52]As previously noted, the evidence is confusing on what transpired after the February
2010 E-mail. Thomas Greaves may not be asserting a deficiency because he has taken over
Brand Makers and there is no need to execute on the property.

[53]Archibald's ex-wife is the sister of James Greaves's wife.  Thomas Greaves is James
Greaves' father.

[54]The Transfer occurred several months prior to Plaintiffs' judgment against Archibald.

[55]Given the facts in this case, the Court does not consider the Transfer that occurred
seven months before the petition date to be a transfer immediately before the petition date.  The
fact that a transfer occurred in close proximity to the bankruptcy petition date is not per se
evidence of fraud, for purposes of  § 727.  *In re Stewart*, 263 B.R. 608, 613 (10th Cir. BAP
2001).

[56]*In re Stewart*, 263 B.R. 608, 618 (10th Cir. BAP 2001).

Brand Makers leading up to February 2010, and the substantial debt faced by Brand Makers, and with no evidence to the contrary, the Court can only conclude that in February 2010, Archibald's equity interest in Brand Makers was of little or no value. The transfer of an asset that has little or no value in exchange for full or partial satisfaction of an antecedent debt of substantial size, without more, does not result in a loss or deficiency of assets and will not trigger denial of a discharge under § 727(a)(5).

Even assuming that Plaintiffs have proved a loss or deficiency of assets occurred, *Archibald did explain the loss*. The explanation is, as Plaintiffs argue, that the asset was transferred to Thomas Greaves.

## CONCLUSION

Based on the foregoing, the Court concludes, as a matter of law, that Plaintiffs have failed to establish by a preponderance of evidence that their debt was obtained by "false pretense, a false representation, or actual fraud. Therefore, Plaintiffs' debt should not be excepted from discharge under § 523(a)(2)(A).

Based on the foregoing, the Court also concludes, as a matter of law, that Plaintiffs have failed to establish by a preponderance of evidence that Archibald, "with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated or concealed – (A) property of the debtor, within one year before the date of the filing of the petition." Plaintiffs have also failed to establish that Archibald "failed to explain satisfactorily,... any loss of assets or deficiency to meet" his liabilities. Therefore, Archibald should be granted a discharge under 11 U.S.C § 727.

35

_____ooo0ooo_____

**SERVICE LIST**

Service of the foregoing **Memorandum Decision** will be effected through the Bankruptcy Noticing Center to the following parties.

Jared Inouye
Bennett Tueller Johnson & Deere
3165 E. Millrock Dr., Suite 500
Salt Lake City, UT 84121

Kevin Worthy
Sumsion Business Law, LLC
Wells Fargo Center
86 N. University Ave.
Suite 400
Provo, UT 84601

Steven R. Sumsion
Sumsion Business Law, LLC
Wells Fargo Center
86 North University Ave., Suite 400
Provo, UT 84601